COMMONWEALTH *vs.* ERIC H. ANDERSON, JR.

Plymouth. November 10, 2006. - March 19, 2007.

Present: MARSHALL, C.J., GREANEY, SPINA, SOSMAN, & CORDY, JJ.[1]

*Homicide. Practice, Criminal,* Capital case, Admissions and confessions, Assistance of counsel, Waiver. *Constitutional Law,* Admissions and confessions, Assistance of counsel, Waiver of constitutional rights. *Due Process
of Law,* Assistance of counsel. *Evidence,* Admissions and confessions,
Relevancy and materiality, Prior misconduct. *Waiver.*

At a murder trial, the judge did not err in admitting in evidence statements
made by the defendant to police in the absence of counsel after the
defendant had been indicted by the grand jury, where the defendant had
initiated the meeting with the police and had knowingly, voluntarily, and
intelligently waived his right to counsel before speaking with them, and
where, at any rate, the statements were of little importance in the context
of the evidence actually introduced at trial. [553-559]

At a murder trial, neither the admission in evidence of testimony from three
witnesses about the defendant's skill with a knife nor defense counsel's
failure to object thereto created a substantial likelihood of a miscarriage of
justice, where the testimony, in combination with other evidence, tended to
prove that the defendant possessed the means and ability to commit the
crime. [559-560]

At the trial of a murder indictment arising from the stabbing of a female
victim, evidence of the defendant's misogynistic statements and his statements concerning his defacing of a woman's photograph were properly offered as admissions of a party opponent, where they tended, in conjunction
with other evidence, to establish the defendant's guilt; moreover, that the
statements were remote in time from the murder did not render them
inadmissible, and any questions as to the reliability of the statements and
the inferences to be drawn from them were for the jury. [560-563]

No reason appeared on the record of a murder trial for this court to grant
relief under G. L. c. 278, § 33E. [563-564]

INDICTMENT found and returned in the Superior Court Department on November 17, 1998.

A pretrial motion to suppress evidence was heard by *Richard
J. Chin,* J., and the case was tried before *Patrick F. Brady,* J.

[1]Justice Sosman participated in the deliberation on this case prior to her
death.

*Stella Robinson* for the defendant.

*Mary E. Lee & John E. Bradley*, Assistant District Attorneys, for the Commonwealth.

CORDY, J. On May 14, 1977, Ruth M. Masters was brutally murdered as she rode her bicycle in the Myles Standish State Forest located in Plymouth. A widening police search for her killer ensued in the weeks and months that followed. Eric Anderson was interviewed by police four and one-half months after the investigation commenced. His automobile and its roof rack were photographed. He claimed to have no involvement in the crime, and was apparently not viewed as a prime suspect. Shortly thereafter, Anderson was convicted and sentenced to State prison for an unrelated assault. No arrest was made in the murder of Ruth Masters, and months stretched into years.

In late 1994, State police Lieutenant Richard Nagle, attached to the Plymouth County district attorney's office, was assigned to reexamine the investigative files in the still unsolved murder of Masters. Witnesses interviewed in 1977 and 1978 were recontacted. State of the art forensic testing was done on the evidence gathered at the time, and new leads were pursued. In 1998, Anderson was indicted for the murder of Ruth Masters. In 2003, he was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty.

In his appeal, Anderson does not contest the sufficiency of the evidence. Our review of the record confirms that such a ground would be futile: eyewitnesses observed Anderson (and his automobile) in the State forest on the day of the murder stalking another female bicycler; testimony from Anderson's family members established his familiarity with the State forest and placed the type of weapons used in the deadly assault on Masters in his possession at the time; and admissions made years later to inmates who shared his cell block at the Massachusetts Correctional Institution at Norfolk (MCI-Norfolk) contained damning details of his savage assault on that day.

Rather, Anderson argues that the trial judge erred in admitting (1) statements he made to police in the absence of counsel after he was indicted by a grand jury; (2) testimony regarding his skill at using a sharp knife and suggesting his commission of other criminal acts; and (3) testimony regarding his

misogynistic statements and the defacing of a woman's photo-
graph occurring ten years after the murder. Anderson also
contends that his trial counsel was ineffective in failing to object
to the admission of some of this testimony at trial. Finally,
Anderson asks the court to reduce the verdict to murder in the
second degree, pursuant to our authority under G. L. c. 278,
§ 33E, in view of evidence that he was impaired by intoxication
at the time of the crime.[2] We affirm.

*Discussion.* The facts adduced at the hearing on Anderson's
motion to suppress and at trial, which are relevant to the
consideration of Anderson's claims, are set out in the discussion
of those claims below.

1. *Anderson's postindictment statements.* By the time of
Anderson's indictment in 1998, he had been released from
MCI-Norfolk and was serving a twenty-five-year prison
sentence at the State prison in Thomaston, Maine.[3] Several
years prior to the indictment, Detective Nagle had attempted to
interview Anderson at the prison. Anderson had declined to
speak to him, apparently asserting his right to counsel under the
Fifth Amendment to the United States Constitution. On the day
that the indictment was publicly announced, November 17,
1998, Nagle alerted Maine prison authorities so that they could
take whatever precautionary steps they felt were advisable with
regard to Anderson's custodial status.

On Sunday, November 22, after reading a newspaper report
about the indictment, attorney Bruce Ferg, a senior trial attorney
with the Committee for Public Counsel Services (CPCS),
contacted CPCS's chief counsel, William Leahy, and asked if he
could be assigned to represent Anderson,[4] under a procedure
adopted by CPCS pursuant to G. L. c. 211D, § 5 (assignment of

_____

[2]The defense at trial was misidentification, not impairment or lack of
requisite intent. Anderson's counsel declined the judge's offer to give a
specific instruction on intoxication because of his concern about its effect on
the defense he was pressing at trial.

[3]Anderson was released from Massachusetts Correctional Institution at
Norfolk (MCI-Norfolk) in 1988. He began serving his Maine State prison
sentence "sometime in the 1990s."

[4]Attorney Bruce Ferg was aware that Anderson had been represented at
some previous time by the Committee for Public Counsel Services (CPCS) in
connection with another matter.

counsel by CPCS), and G. L. c. 211D, § 8 (assignment of counsel to indigent persons accused of murder).[5] Leahy agreed, and on Monday, November 23, he sent a memorandum to the presiding judge of the Plymouth County Superior Court notifying the court of his assignment of Ferg to represent Anderson and "requesting your approval of that assignment." See G. L. c. 211D, § 8 (CPCS assignments "subject to the approval of the justice making the determination of indigency"). At this point, Anderson had not requested counsel, had not been determined to be indigent, and had had no contact with Ferg or CPCS about the indictment.[6] On November 30, 1998, a judge in the Superior Court approved Ferg's assignment to the case.

In the interim, also on November 23, Ferg hand-delivered a letter to assistant district attorney Joseph P. Gaughan informing Gaughan that Leahy had assigned him to represent Anderson. The letter stated that "no attempt should be made to interrogate Mr. Anderson or to obtain any physical or documentary evidence from him without my knowledge and express approval." The letter also informed Gaughan that Ferg would be away over the Thanksgiving holiday, returning on Monday, November 30. Ferg did not contact Anderson prior to leaving for the holiday, and Anderson was unaware that counsel had been assigned by CPCS to represent him in the case.

---

[5]General Laws c. 211D, § 5, provides that CPCS "shall establish, supervise and maintain a system for the appointment or assignment of counsel at any stage of a proceeding, either criminal or noncriminal in nature, provided, however, that the laws of the commonwealth or the rules of the supreme judicial court require that a person in such proceeding be represented by counsel; and, provided further, that such person is unable to obtain counsel by reason of his indigency. The committee may also establish a system for the provision of counsel in any pre-arraignment procedure. A justice or associate justice shall assign a case to the committee, as hereafter provided, after receiving .from the probation officer a written report containing the probation officer's opinion as to the defendant's ability to pay for counsel, based on the standards and procedures provided for in section two."

General Laws c. 211D, § 8, provides: "Upon a determination by a court that a person accused of murder in the first or second degree is indigent, the chief counsel or his designee may assign the case to either the public defender division or the private counsel division, subject to the approval of the justice making the determination of indigency."

[6]The motion judge found that CPCS had reason to believe that Anderson could be indigent.

On Wednesday, November 25, approximately one week after being told of his indictment by prison officials, Anderson went to the director of security at the Maine State Prison and said that he wanted to plead guilty to the murder of Ruth Masters. The following day, Thanksgiving, the director contacted Nagle and informed him of Anderson's statement and Anderson's request to speak to "the investigator or someone from the District Attorney's office." On Friday, November 27, Nagle traveled to Maine to speak to Anderson. He was accompanied by a detective with the Plymouth police department, two assistant district attorneys, and an employee of the district attorney's office who was prepared to videotape the interview if necessary. Ferg was not contacted by either Nagle or Gaughan about this trip, nor was his permission sought to interview Anderson.

Nagle and Anderson met in an interview room at the prison.[7] Nagle began the meeting by stating that he understood that Anderson wanted to talk to him about the murder of Ruth Masters. Anderson nodded in the affirmative, and Nagle then reminded him that the "last time we talked you said you wanted to talk to an attorney." Anderson replied, "I want to get this over with." Nagle then read Anderson his Miranda rights and asked Anderson to read and sign a Miranda rights form, which he did. Nagle then showed Anderson the letter Ferg wrote to Gaughan and explained that Ferg was an attorney who is "going to represent you when you come down here in Massachusetts," and that he "wishes that you do not speak to anyone." Anderson read the letter and signed his name at the bottom. He told Nagle that he wanted to speak to him. Anderson proceeded to tell Nagle that he was innocent but wanted to plead guilty, "hav[ing] accepted the fact that I'm going to die here." A discussion ensued. In response to Nagle's questions about the murder, Anderson continued to deny that he killed Ruth Masters, and provided an alibi for his whereabouts on the day it happened. He also described the automobile and roof rack he owned in 1977.[8] Anderson asked Nagle if he could remain in Maine until the holiday season ended (before being transported to Massachusetts)

---

[7]The detective was also present in the room. Representatives of the district attorney's office remained outside.

[8]While other subjects were discussed by Lieutenant Richard Nagle and

so that he could "square away" his wooden crafts. At some point, when Nagle told Anderson that he had spoken to inmates with whom Anderson had served his sentence at MCI-Norfolk, Anderson got angry and asked for an attorney. Nagle ceased questioning and the interview ended.

Anderson subsequently filed a motion to suppress statements he made to Nagle during this meeting on the grounds that their admission would violate his privilege against self-incrimination and his right to the assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[9] Following an evidentiary hearing, a judge in the Superior Court denied the motion to suppress, finding that Anderson had initiated the meeting with Nagle and had knowingly, voluntarily, and intelligently waived his right to counsel before speaking with him. As the motion judge noted, "[a]part from the absence of counsel, [Anderson] does not argue that the waiver was otherwise involuntary."

The Sixth Amendment and art. 12 confer the right to the assistance and advice of counsel in order to protect the unaided layman at critical confrontations with the government after being charged with a specific crime. See *McNeil* v. *Wisconsin*, 501 U.S. 171, 177-178 (1991); *Commonwealth* v. *Rainwater*, 425

Anderson during this interview, Anderson's alibi and the statements he made about the automobile and roof racks he owned in 1977 were the only statements from the November 27 interview admitted in evidence at the trial.

[9]The original motion filed also sought suppression of any statements Anderson made to police officers or representatives of the prosecution on October 1, 1999, when Anderson was eventually transported from Maine to Massachusetts so that he could be arraigned. Although there was no ruling as to the admissibility of such statements, none was introduced at trial.

Anderson also claimed that the assistant district attorney violated Mass. R. Prof. C. 4.2, 426 Mass. 1402 (1998), when he authorized Nagle to interview Anderson after knowing that CPCS had assigned counsel. While this claim was made in Anderson's motion to suppress and it was discussed briefly at the evidentiary hearing, Anderson made no further argument on the subject in the memorandum he filed after the hearing, and the judge makes no mention of the claim in his memorandum of decision. We decline to address the issue other than to state that the remedy of suppression would not be available in any event. *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 754 (2002) (no resulting prejudice warranting reversal arising from alleged violation of rule 4.2 where defendant informed his attorneys advised against continued communication).

Mass. 540, 557 (1997), cert. denied, 522 U.S. 1095 (1998). The right attaches at the time judicial proceedings are commenced — in this case, on the return of the indictment. See *Commonwealth* v. *Torres*, 442 Mass. 554, 570 (2004). See also *Fellers* v. *United States*, 540 U.S. 519, 523 (2004). Once the right has attached, the State has "an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protections" it affords. *Maine* v. *Moulton*, 474 U.S. 159, 171 (1985) (government's surreptitious recording of defendant's discussion with cooperating codefendant after indictment and in absence of counsel circumvented Sixth Amendment). *Commonwealth* v. *Rainwater, supra* at 550. However, a defendant whose "right to counsel has attached by virtue of an indictment may execute a knowing and intelligent waiver of that right in the course of a police-initiated interrogation." *Michigan* v. *Harvey*, 494 U.S. 344, 352 (1990), citing *Patterson* v. *Illinois*, 487 U.S. 285 (1988). *Commonwealth* v. *Torres, supra* at 571. To be sure, if an accused has requested counsel or counsel has been appointed for him, the police may not initiate further interrogation until counsel has been made available to him, *Michigan* v. *Jackson*, 475 U.S. 625, 635 (1986), but "nothing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney." *Michigan* v. *Harvey, supra.*

"To be valid, [a] waiver must be voluntary, and there must be an informed and intentional relinquishment of a known right. . . . For these purposes, Miranda warnings, although devised to inform suspects of their Fifth Amendment rights, are also sufficient to convey the substance of Sixth Amendment rights." *Commonwealth* v. *Torres, supra* at 571-572, citing *Patterson* v. *Illinois, supra* at 296. In evaluating the validity of a waiver, a court is to consider the "totality of the circumstances" under which it was made, *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000), and cases cited, indulging "in every reasonable presumption against" it. *Commonwealth* v. *Torres, supra* at 571, quoting *Brewer* v. *Williams*, 430 U.S. 387, 404 (1977). The Commonwealth bears the burden of proving a valid waiver beyond a reasonable doubt. See *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 751 (2002), citing *Commonwealth* v. *Magee*, 423 Mass. 381, 386 (1996).

We review a judge's determination regarding the waiver of constitutional rights, accepting "the judge's subsidiary findings of fact absent clear error, [giving] substantial deference to the judge's ultimate findings and conclusions of law, but independently [reviewing] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Vao Sok, supra,* quoting *Commonwealth* v. *Mello,* 420 Mass. 375, 381 n.8 (1995). The judge found that Anderson initiated contact with Nagle after learning of his indictment; was advised fully of his Miranda rights, including his right to consult with counsel and to have counsel present, before speaking to Nagle (indeed before Nagle would speak to him); and was appropriately advised both that Ferg had been assigned by CPCS to represent him in the matter, and that Ferg was advising Anderson not to speak to the police about it. In these circumstances, the judge's conclusion that Anderson intentionally, knowingly, and voluntarily waived his Fifth and Sixth Amendment rights to counsel for purposes of his postindictment questioning on November 27 was constitutionally sound.

Whether we conclude that Anderson was represented by counsel in light of the CPCS assignment, or that he was "not actually represented by counsel," *Commonwealth* v. *Torres, supra* at 573 n.15, because there had been no determination of indigency and the CPCS assignment had not then been approved by a judge of the Superior Court, the fact remains that the November 27 meeting was not a police-initiated interrogation. If Anderson had been represented by counsel, he could still choose, on his own, to initiate contact with the police and validly waive his Sixth Amendment right to counsel for purposes of a postindictment interview. *Michigan* v. *Harvey, supra* at 352-353. *Commonwealth* v. *Torres, supra* at 571-572. If he was unrepresented and had not requested counsel, he could execute a valid waiver of counsel for such an interview even if it was police initiated, so long as he was sufficiently advised of his constitutional right to counsel. *Patterson* v. *Illinois, supra* at 292-296.[10] In either event, the Miranda warnings Anderson received were adequate to apprise him of his Fifth and Sixth

[10]*Fellers* v. *United States,* 540 U.S. 519, 523-525 (2004), is not to the contrary. In that case, the Supreme Court concluded that a statement

Amendment rights. *Id.* at 296-297. *Commonwealth* v. *Torres,* *supra* at 572.[11] A different case, at least under art. 12, would have been presented if Nagle had not fully informed Anderson of Ferg's entry into the case and Ferg's request that Anderson not be interviewed. A waiver obtained in such circumstances would not be knowing and intelligent within the meaning of art. 12. *Commonwealth* v. *Mavredakis,* 430 Mass. 848, 861-862 (2000) (art. 12 requires police officers to inform suspect of attorney's effort to provide legal advice; suspect's knowledge of that effort necessary to effect knowing and intelligent waiver of Miranda rights).

Anderson asks the court to extend the protection art. 12 affords to the right to counsel beyond that which the Sixth Amendment provides in the circumstances presented here. Specifically, Anderson asks that we adopt a rule similar to that adopted by the New York Court of Appeals under the New York State Constitution, to the effect that "[o]nce a lawyer has entered a criminal proceeding representing a defendant in connection with criminal charges under investigation, the defendant in custody may not waive his right to counsel in the absence of the lawyer." *People* v. *Hobson,* 39 N.Y.2d 479, 481 (1976). We

"deliberately elicited" by police after the defendant was indicted, and in the absence of counsel, violated the Sixth Amendment, where the (noncustodial) defendant had not been informed of his right to counsel at the time the statement was elicited by the police, and where there was therefore no valid waiver of that right.

[11]Anderson also claims that, in not waiting for Ferg to return on November 30 before traveling to Maine to speak to Anderson, the police (and prosecutor) acted to circumvent his right to counsel under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. We disagree. The fact that the police responded promptly to a message from Anderson that he wanted to plead guilty to the murder is hardly surprising or manipulative of Anderson's circumstances. In any event, it does not amount to the type of circumvention considered to be in derogation of the defendant's right to counsel. See, e.g., *Maine* v. *Moulton,* 474 U.S. 159, 176-180 (1985) (Sixth Amendment right circumvented where State arranged to record conversations between defendant and undercover informant [and codefendant] during meeting to discuss pending charges and defense strategy); *United States* v. *Henry,* 447 U.S. 264 (1980) (Sixth Amendment right circumvented where State created situation likely to induce indicted defendant in State custody to make incriminating statements to undercover informant, a fellow inmate who received contingent fee and was under government instructions).

acknowledge the concerns that motivated that court to adopt such a bright-line rule, and in particular its desire to "protect the individual, often ignorant and uneducated, and always in fear, when faced with the coercive police power of the State." *Id.* at 485. But these concerns can be fairly considered and balanced against both society's legitimate interest in securing voluntary admissions by guilty persons, and the expressly articulated right of an accused, under art. 12, "to be fully heard in his defence by himself, or his council, at his election," within our established framework for evaluating the validity of waivers. Consequently, we decline to adopt such an inflexible rule.

As noted above, in determining whether a waiver of the defendant's Sixth Amendment or corollary art. 12 right to counsel was knowing, intelligent, and voluntary, the court is charged with examining the totality of the circumstances in which the waiver was obtained, indulging every reasonable presumption against it. Among the important circumstances to be considered, of course, are whether the waiver was obtained in a custodial setting and whether it was obtained either in the absence of counsel's presence or in the absence of the defendant's having had the opportunity to consult with counsel.[12] A postindictment waiver obtained in such a setting and without the benefit of counsel's presence or advice is particularly suspect, even if the contact was initiated by the defendant. The Commonwealth's burden to establish the validity of the waiver is, accordingly, an onerous one. The totality of the circumstances present in this case, however, are illustrative of the type of case in which that burden can be met.

Although Anderson was in custody, he was not being held under arrest where decisions regarding the duration and conditions of his confinement might be directly influenced by the police and the prosecutor, making him particularly vulnerable to those whose interests were in obtaining incriminating statements to aid in the prosecution of the case. Rather, Anderson was serving a twenty-five-year State prison sentence, a circumstance

---

[12]Other relevant circumstances to be considered include the defendant's age, education, intelligence, physical and mental stability, and experience with and in the criminal justice system. *Commonwealth* v. *Anderson*, 445 Mass. 195, 203 (2005), citing *Commonwealth* v. *Magee*, 423 Mass. 381, 388 (1996).

that was not subject to change depending on the measure of his accession to the pressure to cooperate inherent in other custodial settings. In addition, Anderson's experience with the criminal justice system in prior serious criminal matters made him acutely aware (beyond mere verbal warnings) of his right to consult with counsel and of the importance of that right in concrete terms as a criminal defendant. Finally, Anderson's choice to initiate contact with police and then to proceed, even after knowing that counsel had been appointed and did not want him to speak to them, was decidedly not the product of an "ignorant and uneducated" prisoner. Rather, it was an apparent attempt to get his alibi on record, in some admissible form, through the interview that followed. In light of these and other factors, the judge's determination that the Commonwealth had met its heavy burden is fully supported.

Even were we to conclude that Anderson's art. 12 rights were violated, the statements made to Nagle and admitted in evidence at the trial were harmless beyond a reasonable doubt. At trial, Nagle testified that during his conversation with Anderson on November 27, 1998, Anderson told him he was with his first wife, Elizabeth, on the day that Ruth Masters was killed, in "October of 1977." When Nagle corrected Anderson, reminding him that Ruth Masters was killed in May 1977, Anderson responded, "Yeah, I was with Elizabeth in May of 1977." When asked where he and his first wife were that day, Anderson merely smiled. When Nagle asked Anderson how he knew where he was on the day of the murder, Anderson replied that he had read about it in the newspaper on Monday morning. Asked when Ruth Masters was killed, Anderson said, "Saturday. . . . I know that because [my second wife] Annie was working." Anderson then told Nagle that he and Elizabeth were "down the Cape collecting pine cones" that day. Nagle also testified that, on questioning, Anderson said that he drove a 1970 Chevrolet Nova automobile in 1977, and that he had roof racks which he used if he had his canoe or fishing pole with him.

Neither defense counsel nor the prosecutor made any reference to these statements in their closing arguments. This undoubtedly reflects their view that these statements were of little importance

in the context of the evidence actually introduced at trial. We share that view based on our own independent review of the evidence. Anderson's alibi is innocuous on its face, and his admission to driving a 1970 Chevrolet Nova automobile in 1977 was cumulative of other undisputed evidence in the case establishing the same.

2. *Anderson's skills with a knife.* Anderson argues that testimony from three inmates about his skill with a knife served no legitimate purpose, because there was no evidence that the crime required any special knife skills, and was highly prejudicial. There was no objection to this testimony at trial. We review any error for a substantial likelihood of a miscarriage of justice.[13]

All three inmates were incarcerated with Anderson at MCI-Norfolk in or about 1987.[14] Evan Holtman, who was serving a sentence for manslaughter, testified that Anderson was "really proficient with a razor knife," and that he could take a thick piece of leather "and just [gesture] straight down, leave a mark on it and do a perfect cut. One swipe, a perfect cut." Horace Russell, who was serving a sentence for murder in the second degree and met Anderson when he was working in the prison workshop, testified that Anderson made a variety of leather goods by cutting hides and sold them through a prison gift shop. According to Russell, Anderson "could cut anything" and was good with a knife. Carroll St. Germain, who was serving sentences for murder in the first degree and had also met Anderson in the prison workshop, testified that Anderson was very skilled with a knife — that he could "have that whole hide cut up into little pieces" within minutes.

The medical examiner testified to the type and extent of the

---

[13]Anderson also contends that his attorney was constitutionally ineffective in failing to object to this evidence. Under G. L. c. 278, § 33E, we review claims of ineffective assistance of counsel under the same standard. *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 758 (2002), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

[14]This court previously had affirmed the denial of the Commonwealth's petition under G. L. c. 211, § 3, to review the denial of its motion in limine to admit evidence of the crime that resulted in Anderson's incarceration at MCI-Norfolk, as well as evidence of the crime that resulted in his lengthy sentence of incarceration in Maine. *Commonwealth* v. *Anderson*, 439 Mass. 1007 (2003).

knife wounds inflicted by the killer, and the jury saw photographs of the victim's extensively mutilated body. Parts of the body were completely excised and one incision cut through the abdominal cavity and into the bone. Based on this evidence, a reasonable juror could infer that the killer possessed some degree of skill with a knife, and was capable of wielding it with precision and strength. Testimony about Anderson's proficiency with a knife, combined with testimony from other witnesses regarding the razor sharp ("filleting") knife that Anderson carried in 1977, tended to prove that Anderson possessed the means and ability to commit the crime, thus making it relevant to whether he was the killer. See *Commonwealth* v. *Otsuki*, 411 Mass. 218, 235-236 (1991) (testimony by witness to seeing defendant with gun nearly identical to murder weapon admissible to show defendant possessed means to accomplish crime); *Lemay* v. *State*, 264 Ga. 263, 265 (1994) (witness's testimony about defendant's skill with knife admissible to show defendant's proficiency in using a knife despite incidental reflection on defendant's character where victim killed by knife and razor).

If evidence is relevant, it is admissible unless its prejudicial nature is determined to outweigh its relevance in some significant respect. Such a determination is left to the sound discretion of the trial judge. *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990). Here, the testimony that Anderson was skilled in using a knife to cut leather was not so highly prejudicial as to outweigh its relevance. The ability to cut leather easily and with precision for the purpose of making leather goods is not a trait a jury necessarily would view negatively. See *Lemay* v. *State, supra* at 265; *State* v. *Hartman*, 93 Ohio St. 3d 274, 281-282 (2001) (where victim killed by stabbing, defendant chef's set of kitchen knives admissible to show access to and familiarity with using knives). Consequently, it would not have been error for the judge to have ruled this evidence admissible had it been objected to at the time. In any event, the admission of the evidence, and counsel's failure to object to it, did not result in a substantial likelihood of a miscarriage of justice.

3. *Anderson's statements in prison.*[15] Holtman testified that in 1987, he observed a photographic poster in Anderson's cell of a

---

[15]Inmate Horace Russell testified in detail about Anderson's admission to

woman that Anderson had altered by cutting out the breasts and vaginal area, and slicing the throat, wounds strikingly similar to those inflicted on the victim. When Holtman mentioned the poster to Anderson, Anderson replied, "She's never looked better. Leave her like that." Holtman also testified that while talking one day, Anderson told him, "Women are all [expletive deleted] and they all want their own way. They use their sexuality to get their own way." Anderson then described to Holtman the killing and burying of a woman on Cape Cod, saying that he "cut the femoral artery so they don't struggle and bleed them out. . . . You watch their skin turn grey. You watch the life drain out of them. You watch their eyes roll over in their head. And then you just cut them up into pieces to bury them to get rid of the body."

St. Germain testified that he and Anderson got into an altercation in which St. Germain told Anderson to go ahead and attack him because St. Germain was "doing a first degree" and had nothing to lose. In response, Anderson told him "I can operate a knife pretty good. I cut some people up pretty bad on the street. . . . They almost died," including a woman on the South Shore.

Anderson claims that Holtman's testimony constituted evidence of prior bad acts offered to prove propensity, and that, in any event, the conversations were too remote in time from the murder to be relevant, and were more inflammatory than probative.

"Evidence of prior bad acts generally is not admissible to prove bad character or propensity to commit the crime charged, but may be admissible if relevant for some other purpose." *Commonwealth* v. *Jackson*, 417 Mass. 830, 835-836 (1994), citing *Commonwealth* v. *Brusgulis*, 406 Mass. 501, 504-505 (1990), and cases cited. Anderson's statements to Holtman and Holtman's testimony about the altered poster, however, were not offered as prior bad acts; they were offered as admissions of a party. *Commonwealth* v. *DiMonte*, 427 Mass. 233, 243 (1998).

him of killing and cutting up a woman who was riding (or pushing) a bicycle in the Myles Standish State Forest. While he was vigorously cross-examined as to his credibility and the incentives he may have had to fabricate these admissions, the admissibility of his testimony is not challenged on appeal.

P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 8.8.1, at 496 (7th ed. 1999). "An admission in a criminal case is a statement by the accused, direct or implied, of facts pertinent to the issue, which although insufficient in itself to warrant a conviction tends in connection with proof of other facts to establish his guilt." *Commonwealth* v. *Lewin (No. 2)*, 407 Mass. 629, 631 (1990), quoting *Commonwealth* v. *Bonomi*, 335 Mass. 327, 347 (1957).

It was well within the purview of the jury to consider whether the poster, Anderson's comments to Holtman about the poster, and his description of killing and cutting up a woman on the "Cape" were admissions by Anderson concerning his involvement in the murder of Ruth Masters. A statement need not be specific to constitute an admission so long as it is relevant and tends, in conjunction with other evidence, to establish the defendant's guilt. See *Commonwealth* v. *Wood*, 384 Mass. 641, 643-644 (1981), and cases cited. That Anderson made these statements ten years after the killing of Ruth Masters did not make them inadmissible. Although evidence of prior bad acts may not be admissible if their occurrence is too remote in time from the act charged to be probative, *Commonwealth* v. *Helfant*, 398 Mass. 214, 228 n.13 (1986), we are unaware of any such rule applicable to admissions by a party. We find no error.

Anderson contends that the testimony of St. Germain — that Anderson told him he had cut up a woman on the South Shore with a knife who had almost died — should not have been admitted because it was not relevant to whether Anderson killed Ruth Masters and could not qualify as an admission, because Anderson stated that the victim "almost died" and the person who murdered Ruth Masters must have known that she was dead. However, within the context of the conversation to which St. Germain testified, a jury could conclude that Anderson was speaking of attacking Ruth Masters. The conversation between Anderson and St. Germain was heated, and St. Germain told Anderson that if he attacked him, Anderson would "pay the price." The jury could infer that Anderson wanted to respond with a statement about his own prowess with a knife, but downplay the crime he committed instead of expressly admitting to murder, because he feared St. Germain would inform the author-

ities. Of course, they could also infer that Anderson was not admitting to killing Ruth Masters but to some other act of violence. Where a jury may draw more than one inference, it is their duty to decide which inference to draw. See *Commonwealth* v. *Pike*, 430 Mass. 317, 321 (1999); *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992).

Anderson also contends that the statement made to St. Germain did not bear the usual indicia of reliability associated with admissions because Anderson was merely attempting to strengthen his assertion that he was highly skilled with a knife while threatening St. Germain. There is no requirement that a statement made by a defendant satisfy certain criteria qualifying it as "reliable" to be admitted as an admission. As a statement made by a party, it is admissible; the reliability of the statement is a question for the jury. See *Commonwealth* v. *Morgan*, 422 Mass. 373, 379-380 (1996); *Commonwealth* v. *Earltop*, 372 Mass. 199, 201-202 (1977). We see no error in its admission.

Because there was no error in the admission of the testimony of either Holtman and St. Germain, there was no ineffective assistance of counsel.

4. *G. L. c. 278, § 33E.* Anderson contends that we should reduce his conviction under G. L. c. 278, § 33E, to murder in the second degree because of evidence that he was intoxicated. The evidence presented at trial about Anderson's alcohol consumption on the day of the murder was his statement to Russell that he had been "feeling pretty good" that day, and that when he was cutting up the victim, "he was in like a blackout," but "woke up" to realize what he was doing and then tried to cover up the body with "brush and stuff" and make his escape with Masters's bicycle.[16] On the basis of this testimony, the judge offered to include an instruction to the jury about intoxication, which Anderson's trial counsel declined as inconsistent with, and potentially harmful to, his defense. We need not decide whether an instruction would have been required had it been requested. More importantly, for purposes of our review under G. L. c. 278, § 33E, Anderson's claim that

---

[16]There was also testimony of a general nature from Anderson's stepson that Anderson often consumed alcohol during their fishing trips to Myles Standish State Forest.

he was debilitated by intoxicants when he committed the murder is inconsistent with the suspicious, threatening, and stalking behavior observed by the witnesses who saw him in the State forest on several occasions during the day of the murder. The verdict was not unjust, and we decline to reduce it.[17]

5. *Conclusion.* None of Anderson's claims on appeal warrants the reversal of his conviction. After a complete review of the record pursuant to G. L. c. 278, § 33E, we conclude that the interests of justice do not require the entry of a verdict of a lesser degree of guilt or a new trial.

*Judgment affirmed.*

---

[17]Before selecting jurors, the judge asked those who had read, heard, or seen anything about the case to identify themselves, and before empanelling any of these potential jurors, he conducted an individual voir dire to determine whether the person could be an impartial juror. One of the jurors informed the judge that she had seen a reference to the case in the news and that the thing she found most remarkable was the age of the case. When the judge asked the juror whether she would be able to "put that aside, anything that might come back to [her] mind via the media, put that aside and judge this case on the evidence presented," the transcript records the juror as saying, "No." The judge then proceeded to find her indifferent, to which there was no objection.

Although Anderson has not argued that the presence of this juror resulted in a substantial likelihood of a miscarriage of justice, we note that it did not. Where a judge determines a "serious question of possible prejudice" exists, the judge should conduct a voir dire of the jurors. *Commonwealth* v. *John,* 442 Mass. 329, 339 (2004), citing *Commonwealth* v. *Tennison,* 440 Mass. 553, 557 (2003). The judge did precisely that when he asked her whether she could remember any details from the news or any other occasion, and satisfied himself that the juror was impartial.