STATE OF CONNECTICUT *v.* JEFFREY STENNER
(SC 17164)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued November 22, 2006—officially released March 27, 2007

*Conrad Ost Seifert*, special public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom, on the brief, was *Scott J. Murphy*, state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Jeffrey Stenner, directly appeals to this court from the judgment of the trial court convicting him of murder.[1] He claims that the trial court: (1) abused its discretion by admitting evidence of the defendant's participation in another crime; (2) violated the defendant's federal constitutional right to confrontation by admitting hearsay statements of a coconspirator; and (3) violated the defendant's state constitutional right to counsel by admitting an inculpatory statement of the defendant. We affirm the judgment of the trial court.

In a single count information, the defendant was charged with murder in violation of General Statutes §§ 53a-54a[2] and 53a-8.[3] Prior to trial, the defendant

---

[1] The defendant directly appealed to this court from the judgment of conviction pursuant to General Statutes § 51-199 (b) (3).

[2] General Statutes § 53a-54a provides: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

[3] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, com-

moved to exclude evidence of his role in two armored truck robberies, in which the victim, Robert Schmidt, also was involved, based upon the argument that the prejudicial effect of the evidence would substantially outweigh its probative value. Based upon the same argument, the defendant also moved, in limine, to exclude certain testimony by a coconspirator concerning the hearsay statements of a codefendant, Scott Cancel. Finally, on the eve of trial, the defendant moved to suppress a written statement that he had given to members of the Southington police department, on the ground that the statement had been obtained in violation of his sixth amendment right to counsel. The trial court deferred its decision on the defendant's pretrial motion to exclude evidence of the robberies, but ultimately admitted, over the defendant's renewed objection, testimony about the defendant's participation in the crimes. The trial court also admitted Cancel's hearsay, over the renewed objection of the defendant, during the state's case-in-chief, and the court denied the defendant's motion to suppress the defendant's statement to the police. The jury subsequently found the defendant guilty of murder. The trial court rendered a judgment of conviction in accordance with the jury's verdict and sentenced the defendant to life imprisonment pursuant to General Statutes § 53a-35b.[4] This appeal followed.

The jury reasonably could have found the following facts. In 1985, the defendant, a former banker, met and befriended Schmidt in Canton at Zindies, a bar owned by the defendant. Schmidt briefly worked for the defen-

mands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[4] General Statutes § 53a-35b provides: "A sentence of imprisonment for life shall mean a definite sentence of sixty years, unless the sentence is life imprisonment without the possibility of release, imposed pursuant to subsection (g) of section 53a-46a, in which case the sentence shall be imprisonment for the remainder of the defendant's natural life."

dant, but the defendant fired Schmidt after catching him using cocaine, and the two parted ways. They became reacquainted in the spring of 1987 at the defendant's New Britain place of business, Banquer's restaurant. Once again, the defendant hired Schmidt, first as a part-time doorman and bartender, and eventually as a full-time, all-purpose employee. The defendant also hired Perfecto Valle as a cook, and, in 1987, the defendant, Schmidt and Valle orchestrated the robbery of an armored truck.[5] At that time, Schmidt was working as a guard for the armored truck company and was the operation's "inside man." The trio stole more than $1 million, some of which the men shared, but the bulk of which went to run the defendant's fledgling New Britain restaurant.

At the defendant's urging, Schmidt took out a $100,000 life insurance policy in September, 1987. By September, 1988, however, the policy was on the verge of lapsing and, on the advice of his insurance agent, the defendant paid the premium on the policy and converted it into a "key man" policy.[6] At that time, Schmidt named the defendant as the beneficiary. Around the same time, the defendant, disappointed by Schmidt's increasingly disheveled appearance and lax attitude, demoted Schmidt from his full-time job to a part-time one. Nevertheless, the duo planned and executed a second armored truck robbery that same year, and in the spring of 1989, they started a lawn care business together. By December of that year, however, the relationship had soured further, after the defendant again became dissatisfied with Schmidt's work performance. The defendant also refused Schmidt's requests to help

---

[5] Others, including the defendant's former wife, Jill St. John, were implicated in the robbery as well.

[6] A "key man" policy is industry terminology for the insurance policy of an employer on the life of an instrumental employee, which is designed in part to protect the employer from the financial loss in the event of the death of that employee.

with his rent and to borrow the defendant's truck from his landscaping business.

In addition, the defendant learned that Schmidt had discussed the first armored truck robbery with individuals not privy to that crime. He also learned that the Federal Bureau of Investigation (FBI) had interviewed employees of Banquer's restaurant, including Schmidt, in the course of its investigation of the armored truck robberies. The defendant thought, incorrectly, that Schmidt had been serving as an informant for narcotics officers of the New Britain police department. As a result, the defendant was, as he testified, concerned about Schmidt's "proclivity to talk too much . . . ." According to Valle, the defendant said that he would "take care of it." To do so, the defendant turned to Cancel, whom the defendant had met at a gym. Cancel organized a group of men, including John Grzeszczyk, Gilberto Delgado and Salvatore Zampi, to plan Schmidt's murder.[7] Cancel initially told the group only that somebody had a problem with an individual, whom that person wanted "out of the way," and that the team would be financially compensated. Approximately two weeks before the murder of Schmidt, Cancel specifically stated that it was the defendant who wanted somebody killed and that the defendant would pay to have this done. He later informed the men of the identity of Schmidt, whom Cancel did not, himself, know and toward whom he had no particular animosity.

On the evening of December 19, 1989, Cancel and Grzeszczyk met the defendant and Schmidt at Banquer's restaurant. The defendant asked Schmidt to help Cancel and Grzeszczyk with an errand. He agreed, and Cancel and Grzeszczyk then left the restaurant, informing

---

[7] Cancel also was convicted of murder for the death of Schmidt, and this court affirmed that conviction. See *State* v. *Cancel*, 275 Conn. 1, 19, 878 A.2d 1103 (2005).

Schmidt that they would return later to pick him up. As promised, Grzeszczyk arrived at the restaurant later that night, accompanied this time by Delgado. Grzeszczyk, Delgado and Schmidt then proceeded to Schmidt's car. Grzeszczyk sat in the driver's seat, Schmidt sat in the front passenger seat, and Delgado sat behind Schmidt. While on route to their fictitious destination, Delgado strangled Schmidt with a rope. At the same time, Grzeszczyk repeatedly hit Schmidt in the head, in an apparent effort to push him back in the seat. After killing him, Grzeszczyk and Delgado dumped Schmidt's body on the side of a snow bank near the Bethel Church in Southington. Thereafter, they returned to New Britain, where they left Schmidt's car in the parking lot of Banquer's restaurant. They then met with Cancel and Zampi, who destroyed the clothing of Grzeszczyk and Delgado, to discuss the murder.

Early the next morning, the pastor of Bethel Church discovered Schmidt's body. The state medical examiner's office determined that Schmidt had died of asphyxiation from strangulation and that he had suffered a puncture wound to the forehead.[8] That same day, the defendant notified his insurance agent of Schmidt's death and confirmed that the key man policy on Schmidt was in force. Approximately one or two weeks later, Cancel paid Grzeszczyk and Delgado each $1000 with money he had received from the defendant. Shortly thereafter, the defendant again contacted his insurance agent regarding Schmidt's $100,000 life insurance policy, stating that his restaurant was encountering financial troubles and intimating that he was anxious to collect the policy's proceeds.

The effort of the police to identify Schmidt led them to the defendant, who, on December 20, 1989, identified

---

[8] Delgado also had stabbed Schmidt's head with a syringe, purportedly to let air into his arteries.

Schmidt's body and gave a statement regarding his interactions with Schmidt on the night of the murder. Two days later, the police again interviewed the defendant, who provided a written statement. The police and the FBI discussed the possibility of a connection between the armored truck robberies and the murder. Although the police recovered thirteen latent fingerprints from Schmidt's automobile, at the time, the laboratory was unable positively to identify any of the prints, and the police were unable to solve the murder.

In 1995, the state forensics laboratory acquired an automated fingerprint identification system. Subsequent to that acquisition, the Southington police department requested that the state forensics laboratory evaluate the latent fingerprints obtained in their investigation. In 2001, that investigation matched the fingerprints recovered from Schmidt's car with those of Grzeszczyk. After multiple interviews, Grzeszczyk confessed his role in Schmidt's murder and implicated the defendant, Cancel, Zampi and Delgado, all of whom subsequently were charged in connection with Schmidt's murder. See *State* v. *Cancel*, 275 Conn. 1, 5, 878 A.2d 1103 (2005). Grzeszczyk and Delgado both testified against the defendant at his trial, which also included testimony from various law enforcement officials, forensic experts and other witnesses, including the defendant's former wife. Additional facts and procedural history will be set forth as necessary.

I

We turn first to the defendant's claim that the trial court improperly admitted evidence regarding the defendant's involvement in the 1987 and 1988 armored truck robberies. Specifically, the defendant contends that the trial court abused its discretion by allowing extensive testimony regarding the robberies, resulting in prejudice to him. We disagree.

The following additional facts are relevant to this claim. The defendant filed two motions in limine objecting to the introduction of his criminal record as it pertained to the two robberies and to details of the facts and circumstances "leading up to and including the . . . crimes of said robberies."[9] He argued that "[t]he admission in evidence of details of facts and circumstances concerning said robberies would severely prejudice the defendant." After the state made an offer of proof regarding the evidence, the defendant also expressed concern that the jury's passions would be inflamed upon hearing that the defendant "was dressed up as a Santa Claus" during one of the robberies, "because everybody knows about the Santa Claus robber." In support of admitting the evidence, the state argued that it was relevant as to the motive of the defendant, adding: "[T]here was a pending FBI investigation, with the West Hartford [p]olice [d]epartment, of these two armored car robberies, and . . . this defendant was concerned that [Schmidt] would talk and implicate him in these robberies." The trial court overruled the defendant's objections, concluding that evidence of the two armored truck robberies was "relevant to the issue of motive and . . . not so prejudicial as to outweigh the probative value." The court did restrict evidence regarding the robberies, however, to that from "which the jury can find or not find that . . . these robberies were the motive for the murder of [Schmidt]."

Thereafter, the state called to the stand a former police detective, who had investigated the truck robberies. The detective testified that on March 4, 1987, two

[9] The first motion, on October 20, 2003, asked the court to exclude the defendant's criminal record concerning robberies of an armored truck in May, 1987, and December, 1988, unless the defendant testified. The second motion, on October 21, 2003, asked the court to exclude all details of the robberies.

individuals had approached the back of an armored truck at a bank in West Hartford and, displaying firearms, robbed the guards, one of whom was Schmidt, of approximately $1 million. The witness also testified that another $695,000 had been stolen in a second armored truck robbery in West Hartford on December 20, 1988. In that case, the armored truck pulled up by the door of the bank, the guard got out of the truck, and using a hand truck, delivered coin money to the interior of the bank. As he exited the bank with paper money, the guard was approached by a person wearing a Santa Claus beard and hat, who produced a small silver colored revolver and demanded the money. The detective further testified that the defendant and Schmidt were both suspects in the two robberies.

The defendant claims that the witnesses' "detailed answers and information about the two armed robberies and the defendant's involvement" were unduly prejudicial. Although the defendant had objected, in limine, to any testimony regarding the truck robberies, his claim on appeal to this court is, essentially, that the detective's testimony violated the court's restriction on the scope of the evidence because it went into greater detail than that which would have been reasonably necessary to infer motive. The state argues that the defendant did not raise this objection to the testimony at trial and that his claim is, therefore, unpreserved. See *State* v. *Calabrese*, 279 Conn. 393, 408 n.18, 902 A.2d 1044 (2006) (objection to presentation of evidence for first time on appeal renders claim unpreserved). Although during oral argument in this court, the defendant conceded that he did not object, the record indicates that the day after the introduction, without objection, of the challenged testimony, the defendant moved to strike the testimony, "with regard to the Santa Claus outfit . . . ."[10] Accordingly, we conclude that the

[10] Specifically, the defendant stated: "I believe that that indication of the Santa Claus outfit went too far too much detail; it went beyond the line for

defendant preserved this claim for review. We limit our review, however, to the trial court's decision to deny the defendant's motion to strike the specific testimony of the detective that the defendant wore a Santa Claus costume during the commission of the second armored truck robbery, because that is the only claim that the defendant raised in his motion to strike.

"As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged. . . . [Prior misconduct] [e]vidence may be admissible, however, for other purposes, such as to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency. . . . We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh [its] prejudicial effect . . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *O'Neil*, 261 Conn. 49, 80–81, 801 A.2d 730 (2002).

The defendant concedes that the fact that he and Schmidt were suspects in two armored truck robberies

which the court indicated that the state should not go. So at this point in time . . . I'm [going to] ask that the court instruct the jury and ask that that testimony be stricken with regard to the Santa Claus outfit . . . ."

on the date Schmidt was murdered was reasonably susceptible to an inference of motive for the murder, but claims that, "to go from a short, restricted and non-particular evidentiary usage into a full-blown detailed narrative of [the] two robberies . . . was wrong and impermissible." In other words, the defendant argues that the probative value of the testimony that the defendant wore a Santa Claus costume did not outweigh the prejudicial effect of that evidence. The defendant's objection to this testimony, specifically, derives from his claim at trial that the jury could have been exposed to media coverage of the armored truck robbery, and that they, therefore, may have harbored prejudice against the defendant for being "the Santa Claus robber."

In denying the defendant's motion to strike, the trial court concluded that the defendant and the state extensively had canvassed the jurors on their objectivity and their ability to follow the court's instructions, and that, therefore, the fact that the defendant was dressed as Santa Claus during the commission of a robbery, albeit unique, did not "lead the court to believe that [the] jurors would be biased against the defendant and that they would not be able to continue to listen to the case and decide the case on the evidence presented and the instructions on the law." On the basis of its thoughtful consideration of the defendant's objection, we conclude that the trial court did not abuse its discretion in denying the defendant's motion to strike.

## II

We now turn to the second claim of the defendant, namely, that the trial court improperly admitted the hearsay statements of Cancel through the testimony of one of the coconspirators, Grzeszczyk. Specifically, the defendant contends that the challenged statements did not bear adequate indicia of reliability, in violation of

the confrontation clause of the sixth amendment.[11] We conclude that this issue was not preserved at trial and, accordingly, we do not reach the merits of this claim.

The following additional facts are relevant to our disposition of this issue. The defendant filed a motion in limine to exclude all hearsay statements of Cancel.[12] At trial, however, the court allowed the admission of Cancel's challenged statements through the testimony of Grzeszczyk.[13] The defendant's sole argument in his

[11] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

[12] Neither the transcript nor the clerk's docket form reflects any ruling on the defendant's pretrial motion to exclude these statements. The defendant moved for rectification, asking the trial court to state or briefly to articulate the grounds upon which the denial was based. The defendant appended an affidavit of trial counsel, representing that, to the best of his knowledge and belief, the trial court had denied the motion. In her memorandum of decision regarding the defendant's motion for rectification, the trial judge agreed, concluding that, "[g]iven that the statements were admitted, the defendant's objection to their admission must have been overruled by the court." She then stated, "[t]herefore . . . the court *grants* the defendant's motion in limine." (Emphasis added.) Given this ambiguous result, the defendant moved to correct the rectified ruling, which motion the trial judge granted.

[13] The defendant claims that the trial court improperly admitted the following testimony of Grzeszczyk on direct examination by the prosecutor:

"Q. And when—will you tell the jury the first time that [Cancel] talked to you about that?

"A. Well, first he mentioned that he—there was an individual that had a problem that needed to be taken care of, and he asked if I wanted to get involved. And, at first, I didn't care to hear what he had to say, but over time, I—I said okay, that I would participate.

                    * * *

"Q. What did [Cancel] tell you?

"A. He basically told me, after we agreed that we would do this, that it was [the defendant], and that he had a problem with a business associate [of] his, and that he wanted him taken out of the way. . . .

"Q. And in these conversations, what did you understand it meant to take someone out of the way?

"A. Well, at—at first, I thought that [the defendant] was gonna have him roughed up or something like that, but then, afterwards, he told us specifically that he wanted him killed. . . .

"Q. . . . When you agreed to participate in the murder of this individual, what did Mr. Cancel tell you was in it for you?

"A. He said we would be financially compensated.

pretrial motion was that "such hearsay testimony . . . would severely prejudice the defendant." We view this contention, as the trial court undoubtedly did, as claiming that the evidence was hearsay, and that its prejudicial effect outweighed its probative value. For the first time on appeal, however, the defendant argues that the admission of this hearsay violated his right of confrontation under the sixth amendment. The state contends that the defendant's claim is unpreserved because it relies upon a different basis than that raised at trial; see *State* v. *Calabrese*, supra, 279 Conn. 408 n.18; and because the defendant has not requested review of his constitutional claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We agree with the state.

"Appellate review of evidentiary rulings is ordinarily limited to the specific legal [ground] raised by the objection of trial counsel. . . . To permit a party to raise a different ground on appeal than [that] raised during trial would amount to trial by ambuscade, unfair both to the trial court and to the opposing party." (Citations omitted; internal quotation marks omitted.) *State* v. *Sandoval*, 263 Conn. 524, 556, 821 A.2d 247 (2003); see

"Q. And did Mr. Cancel tell you where that money was coming from?

"A. Yes. He said [the defendant] would pay to have this done. . . .

"Q. And how did you learn that the person that you were gonna kill was, in fact, [Schmidt]?

"A. Mr. Cancel informed me that [the defendant] wanted this individual killed.

\* \* \*

"Q. And what did Mr. Cancel want to have happen?

"A. He was gonna have [Schmidt] killed.

"Q. And what did he want you to do?

"A. He wanted me to carry it out.

"Q. And did he tell you whether or not he wanted [Schmidt] killed, or did he want someone else—or someone else wanted him killed?

"A. Someone else wanted him killed.

"Q. What did Scott Cancel tell you about that?

"A. He told me the problem was between him and [the defendant]—[Schmidt] and [the defendant]."

also Practice Book § 60-5.[14] The bases upon which the defendant moved to exclude the statements of Cancel, namely, that the testimony was hearsay and that its probative value would be outweighed by the danger of unfair prejudice, were purely evidentiary in nature. See Conn. Code Evid. § 4-3.[15] On appeal, however, the defendant has abandoned those arguments, relying instead upon the sixth amendment. Although a defendant is entitled to a review of unpreserved constitutional claims under *State* v. *Golding,* supra, 213 Conn. 239–40, the defendant has "fail[ed] to brief his entitlement to *Golding* review. . . . Consequently, we decline to review the [defendant's] constitutional [claim] because [it is] inadequately briefed." (Citations omitted; internal quotation marks omitted.) *Lebron* v. *Commissioner of Correction,* 274 Conn. 507, 532, 876 A.2d 1178 (2005).

The defendant argues that his claim is reviewable nonetheless because the trial court's ruling must have been based upon the specific coconspirator hearsay exception provided by § 8-3 (1) (D) of the Connecticut Code of Evidence,[16] which, he claims, would require that the statement bear " 'adequate indicia of reliability.' " *State* v. *Rivera,* 268 Conn. 351, 362, 844 A.2d 191 (2004), quoting *Ohio* v. *Roberts,* 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980) (interpreting confrontation clause of sixth amendment). Put another way, the defen-

[14] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . ."

[15] Section 4-3 of the Connecticut Code of Evidence provides: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

[16] Section 8-3 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"(1) Statement by a party opponent. A statement that is being offered against a party and is . . . (D) a statement by a coconspirator of a party while the conspiracy is ongoing and in furtherance of the conspiracy . . . ."

dant contends that, because the constitutional issue "was a component or subissue of the larger issue of the admissibility of the . . . hearsay statements of the nontestifying coconspirator . . . the larger issue pre-served the subissue."[17] We are not persuaded.

We agree with the defendant that the most likely basis of the trial court's ruling was the hearsay exception for coconspirators' statements. We disagree, however, that his generic objections—hearsay and undue prejudice—are a sufficient substitute for his failure to provide any *Golding* analysis of his now asserted constitutional claim. That failure is fatal to appellate review of his constitutional claim.

### III

We now turn to the defendant's final claim, namely, that the trial court violated his right to counsel afforded under article first, § 8, of the constitution of Connecti-cut[18] by admitting an inculpatory statement by the defendant, which was obtained after the police had secured a warrant for the defendant's arrest, because that statement was made in the absence of counsel. The defendant's challenge to the admissibility of his statements rests on the proposition that the statements were made after the commencement of adversary judi-cial criminal proceedings, which, he claims, occurred upon the signing of the information by the state's attor-ney. We conclude, to the contrary, that arraignment triggers the right to counsel afforded under the state constitution and, accordingly, that the defendant's state

---

[17] The defendant concedes in his reply brief that, if the "right to confronta-tion analysis is *not* inherent and implicit in the defense motion . . . then the defendant's appellate attorney *should have* explicitly invoked *Golding*." (Emphasis in original.)

[18] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ."

constitutional right to counsel had not yet attached when he made the challenged statements.

The defendant objected to the admission of the challenged statement on federal constitutional grounds, but he did not object under the state constitution.[19] To the extent that his state constitutional claim was not properly preserved, the defendant seeks to prevail under *Golding*.[20] See *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the record is adequate for review, and the defendant's claim, on its face, is of constitutional magnitude. The claim fails to satisfy the third prong of *Golding*, however, because the defendant has not established that a constitutional violation exists. See id.

The following undisputed facts relevant to this claim are set forth by the trial court in its articulation of its order denying the defendant's motion to suppress. In the course of their investigation into Schmidt's death, "Detective [Michael] Shanley and Inspector Larry Skinner of the New Britain state's attorney's office met with [the defendant] on March 16, 2001, at the Cheshire correctional institution in New Hampshire, where the defendant was serving a sentence for a violation of probation of a federal sentence. The defendant was told that the officers were investigating the murder of [Schmidt] and were trying to eliminate suspects through

---

[19] Subsequent to his taking this appeal, the defendant has conceded, in light of this court's recent decision in *State* v. *Pierre*, 277 Conn. 42, 890 A.2d 474, cert. denied, U.S. , 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006), that his federal claim could not succeed. Accordingly, we consider only his state constitutional claim.

[20] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40.

DNA analysis. They asked the defendant for samples of his blood and hair and he agreed to provide them.

"Sometime after their first contact in New Hampshire, the defendant was transferred to a federal prison in Phoenix, Arizona, to finish serving his federal violation of probation sentence. Skinner called the prison and asked prison officials to ask the defendant if he would talk to them and the defendant agreed." It is undisputed that, on August, 2, 2001, the state's attorney for the judicial district of New Britain signed the complaint portion of an information charging the defendant with the crime of murder. On the same day, a judge of the Superior Court signed the arrest warrant portion of the information. The court's articulation continued: "On August 7, 2001, Shanley and Skinner flew to Phoenix to speak to the defendant again. The defendant was brought to a secretary's office within the prison to be interviewed by Shanley and Skinner. When he arrived at the room and when he was interviewed, the defendant was not handcuffed.

"Shanley told the defendant that they were investigating the murder of [Schmidt] and were not able to eliminate him as a suspect. Before discussing the case, Shanley explained to the defendant that he had to be advised of his rights because he was in custody. Shanley did so and the defendant executed a waiver of rights form. For approximately forty-five to fifty minutes, the officers spoke to the defendant but he did not provide them with any substantive information. After Shanley told him that they had an arrest warrant charging him with murder and showed him a certified copy of it, the defendant gave an oral statement which was later memorialized into a four page written statement . . . ." Thereafter, the warrant for the defendant's arrest was lodged as a detainer with the Maricopa County sheriff's department in Phoenix. It was served on the defendant on August 23, 2001, after his extradition to Connecticut.

The court further articulated: "The defendant admitted at the suppression hearing that he was advised of his *Miranda* rights. He corroborated Detective Shanley's testimony that Shanley read the waiver of rights to him and that he understood it. He testified that he also read the form, understood it, and signed it. The defendant admitted that he understood his rights as set forth in the form, that he understood he was waiving his rights and that he was willing to talk to the officers."

The defendant moved to suppress his written statement, claiming that it was taken in violation of his sixth amendment right to counsel. The court ordered a hearing on the defendant's motion and took testimony from Shanley and the defendant. After hearing the testimony and arguments, the court ruled that the defendant's sixth amendment right to counsel had not attached when the state's attorney signed the information on August 2, 2001. The trial court went on to rule that, even if that right had attached, the defendant knowingly and voluntarily waived it. The court rejected the defendant's argument that the officers were required again to advise the defendant of his rights after they had informed him that an arrest warrant already had been issued.

Thereafter, the trial court further articulated its reasons for denying the suppression motion. The court stated that "[i]n Connecticut, an Information . . . is merely a complaint and arrest warrant. . . . After the warrant is served, it is returned to the geographical area court which issued it. The 'RETURN ON ARREST WARRANT' is found on the back of the 'Information' . . . and states as follows: 'Then and there, by virtue of the within and foregoing complaint and warrant, I arrested the body of the within-named accused and read the same in the hearing of said accused; and have said accused here in court for examination.' In the present case, the arrest warrant was filed with the court

on August 23, 2001, when the defendant was brought to court for his arraignment. It was at that point that the 'Information' or formal charges were filed against the defendant."

In *State* v. *Pierre*, 277 Conn. 42, 92, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006), we reached the same conclusion as the trial court in the present case, namely, that the critical stage triggering the protections of the sixth amendment does not occur until the defendant is charged at his arraignment. The defendant urges us now to conclude that the signing of the complaint portion of the information, on August 2, 2001, triggered the right to counsel protection under the state constitution.[21] The defendant argues that the state constitution affords greater protection than its federal counterpart; see, e.g., *State* v. *Stoddard*, 206 Conn. 157, 166, 537 A.2d 446 (1988) (expanding state constitutional right to counsel beyond federal right by requiring that suspects be informed of timely efforts by counsel to render legal assistance); and that, therefore, the state constitutional right to counsel should attach earlier than the federal one. The state counters that the precedent of this court defeats the defendant's claim. We agree with the state.

"[W]e note that [o]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and

---

[21] Unlike *Pierre*, this appeal presents us with the opportunity to analyze, with the benefit of briefing and analysis of the issue based on the factors articulated in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), the point at which, under article first, § 8, of our state constitution, the right to counsel attaches.

whether they find support in the facts set out in the court's memorandum of decision . . . . *State* v. *Mann*, 271 Conn. 300, 322–23, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005), quoting *State* v. *Santos*, 267 Conn. 495, 503, 838 A.2d 981 (2004)." (Internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 92. "[I]n some instances . . . the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992). "As we concluded in *Geisler*, [i]n order to construe the contours of our state constitution and reach reasoned and principled results, the following tools of analysis should be considered to the extent applicable: (1) the textual approach . . . (2) holdings and dicta of this court . . . (3) federal precedent . . . (4) sister state decisions or sibling approach . . . (5) the historical approach, including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations." (Internal quotation marks omitted.) *State* v. *Nash*, 278 Conn. 620, 623–24 n.4, 899 A.2d 1 (2006). The sixth *Geisler* factor focuses on policy considerations. See, e.g., *State* v. *Colon*, 272 Conn. 106, 327, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ." The sixth amendment to the constitution of the United States provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." The defendant concedes that the language of the state constitution does not vary significantly from its federal counterpart. See *State* v.

*Piorkowski*, 243 Conn. 205, 215, 700 A.2d 1146 (1997). Accordingly, the textual approach of article first, § 8, of the state constitution supports the state's position.

The holdings and dicta of this court also weigh in the state's favor. "[T]his court has consistently held [that], a defendant's right to counsel, under the sixth amendment to the United States constitution or its state constitutional counterpart, attaches only at or after the initiation of adversarial judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information or arraignment." (Internal quotation marks omitted.) *State* v. *Palmer*, 206 Conn. 40, 64, 536 A.2d 936 (1988). Although we never specifically had addressed what constitutes the initiation of adversarial judicial criminal proceedings prior to our decision in *Pierre*; see *State* v. *Pierre*, supra, 277 Conn. 95; we consistently had remarked that, whatever that event is, it is the same under both the state and federal constitutions. Id., 93 ("the time of the attachment of the right to counsel under the federal constitution is no different under article first, § 8, of the constitution of Connecticut"); *State* v. *Lewis*, 220 Conn. 602, 612, 600 A.2d 1330 (1991) (same); see also *State* v. *Palmer*, supra, 64 (articulating same point of attachment of both federal and state rights); *State* v. *Vitale*, 190 Conn. 219, 232, 460 A.2d 961 (1983) (same).

In *Pierre*, we concluded that "it is not simply the signing of the information document that triggers the protections of the sixth amendment. Rather, it is the state's decision to move forward with the prosecution of the crimes charged in the information document, by arraigning the suspect and filing the information with the court, that signifies the state's commitment to prosecute as well as the initiation of the adversary judicial proceedings that trigger a defendant's right to counsel under the sixth amendment." *State* v. *Pierre*, supra, 277 Conn. 95. Having consistently stated that the federal

and state constitutional rights attach at the same time, and having specifically concluded, in *Pierre*, that the sixth amendment right to counsel attaches upon arraignment, the precedents of this court strongly support the conclusion that the right to counsel under article first, § 8, of the constitution of Connecticut is also triggered at arraignment.

The foregoing decisions apply the standard set forth by the United States Supreme Court in *Kirby* v. *Illinois*, 406 U.S. 682, 688, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972), namely, that the sixth amendment right to counsel "attaches only at or after the time that adversarial judicial proceedings have been initiated . . . ." See *State* v. *Pierre*, supra, 277 Conn. 92; see also *State* v. *Vitale*, supra, 190 Conn. 232 ("[w]e have previously adopted the *Kirby* formulation as marking the time when the right to counsel attaches"). We have construed the federal precedent, as applied to our state procedure, as meaning that the federal constitutional right to counsel attaches at arraignment. Therefore, federal precedent, the third *Geisler* prong, also supports our conclusion that the right to counsel under the state constitution is triggered at arraignment.

In addition, the defendant concedes that the decisions of sister states—the fourth *Geisler* prong—do not support his position. See *State* v. *Liulama*, 9 Haw. App. 447, 454, 845 P.2d 1194 (1992); *State* v. *Hattaway*, 621 So. 2d 796, 806 (La. 1993); *State* v. *Sanchez*, 129 N.J. 261, 274, 609 A.2d 400 (1992); *People* v. *Settles*, 46 N.Y.2d 154, 162–63, 385 N.E.2d 612, 412 N.Y.S.2d 874 (1978). Each of the foregoing cases interpreted its state's constitutional protections for criminal defendants to apply *after* the commencement of adverse judicial criminal proceedings. Accordingly, the defendant, at oral argument before this court, acknowledged that a decision in his favor would "set the state of Connecticut apart."

Moreover, we conclude that neither the historical underpinnings of the state constitution nor policy concerns—the fifth and sixth *Geisler* prongs—warrant departure from the federal rule. Though "[t]his state has had a long history of recognizing the significance of the right to counsel"; *State* v. *Stoddard*, supra, 206 Conn. 164; "this history specifically illuminates the right to counsel that attaches *after the initiation of adversary judicial proceedings* . . . ." (Emphasis added.) Id., 166. Thus, the extent to which the historical liberality of the state constitutional right to counsel might transcend that of the federal right does not militate against their coterminous attachment. However great its protection, the state constitutional right to counsel, like its federal counterpart, has only been afforded to a person charged with a crime. See id., 165, citing 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 399.[22]

Thus, the state and federal constitutions share the same policy behind fixing the point of attachment of the right to counsel at the point of initiation of adversary judicial proceedings, namely, protecting the rights of those against whom the state has set in motion its prosecutorial machine. Concluding that an interrogation following an arrest, but prior to arraignment, does not call into play the sixth amendment right to counsel, we noted, in *Vitale*, that "[the defendant] seeks to analogize his situation . . . to that of a defendant who has been formally charged with a crime by indictment or information. From such a defendant the government may not elicit self-incriminating evidence in the absence of counsel." *State* v. *Vitale*, supra, 190 Conn. 231, citing *Massiah* v. *United States*, 377 U.S. 201, 206, 84 S. Ct.

---

[22] The defendant argues that *State* v. *Stoddard*, supra, 206 Conn. 157, stands for the proposition that the state right to counsel provides more protection than the federal right and that, therefore, the state right attaches earlier. We are not persuaded. As previously discussed, the parameters of the right do not dictate its point of attachment.

1199, 12 L. Ed. 2d 246 (1964). Because "[t]he rights of a defendant against self-incrimination prior to the formal commencement of a judicial criminal proceeding against him are . . . protected by the *Miranda* warning requirements"; *State* v. *Vitale,* supra, 233; we said that there is "no necessity for superimposing the more complete *Massiah* restrictions during the period between the arrest and the filing of an information or indictment." Id. The same logic holds true under the state constitution.

On the basis of the foregoing *Geisler* analysis, we conclude that the right to counsel under the state constitution is triggered at the same time as the right to counsel afforded by the sixth amendment of the federal constitution. Accordingly, the defendant's state constitutional right to counsel had not yet attached at the time of his statement to the police on August 7, 2001, because the defendant was not arraigned until August 23, 2001.

In *Fellers* v. *United States,* 540 U.S. 519, 524, 124 S. Ct. 1019, 157 L. Ed. 2d 1016 (2004), the Supreme Court concluded that the sixth amendment had attached upon the grand jury indictment of a federal criminal defendant and that the defendant's statements to the police, which took place outside the presence of counsel and in the absence of any waiver of the defendant's right to counsel, violated the sixth amendment. The defendant argues that *Fellers* is analogous to the present case and that Connecticut precedent should be harmonized with that case, "so that the time of attachment reaches back to the time when a felony information and arrest warrant are signed by judicial officers."

In support of his argument, the defendant also cites *Commonwealth* v. *Torres,* 442 Mass. 554, 813 N.E.2d 1261 (2004). In that case, the Massachusetts Supreme Judicial Court rejected the trial court's conclusion that the defendant's right to counsel did not apply to his

statements to police, which were made *before* the defendant's arraignment. Id., 570–71. The court concluded that the sixth amendment right to counsel had attached upon the defendant's indictment. The court said, "[t]he [s]ixth [a]mendment right to counsel is triggered at or after the time that judicial proceedings have been initiated . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment . . . . Thus, while arraignment is one procedural step in criminal proceedings that will trigger the [s]ixth [a]mendment right to counsel, other steps occurring prior to arraignment may operate to initiate criminal proceedings and trigger those rights at an earlier stage. . . . In ascertaining when a particular defendant's [s]ixth [a]mendment right to counsel attached, we must identify, based on the particular procedural devices employed in that defendant's case, the earliest event that initiated formal criminal proceedings against him. . . . Here, the [c]ommonwealth proceeded by way of direct indictment." (Citations omitted; internal quotation marks omitted.) Id.

We conclude that both *Fellers* and *Torres* are inapposite to the present case because each applied the sixth amendment to a different procedural stage—with a different mechanism for initiating judicial proceedings— than the one found in the present case. Like the court in *Torres*, we "must identify . . . the earliest event that initiated formal criminal proceedings against [the defendant]." Id., 571. In the present case, however, that event was the defendant's arraignment on August 23, 2001, a result that is consistent with the federal standard articulated in *Kirby* v. *Illinois*, supra, 406 U.S. 689 (right to counsel is triggered at initiation of judicial criminal proceedings), and followed in *Fellers* v. *United States*, supra, 540 U.S. 523.

The judgment is affirmed.

In this opinion the other justices concurred.